UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FLOW TECHNOLOGIES INTERMEDIATE HOLDCO II, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SEAN COHOLAN, <br><br> Defendant. | Case No.  26-cv-01845-RS <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION** |

## I. INTRODUCTION

Plaintiffs United Flow Technologies Intermediate HoldCo II, LLC ("UFT") and TW Associates, LLC (d/b/a MISCOwater) bring this motion for a preliminary injunction ("PI"). They seek to enjoin their former employee, Defendant Sean Coholan, from using Plaintiffs' trade secrets in any way or contacting any customers or distributors included in the misappropriated materials for six months and to require him to return trade secret materials; submit to inspection of his devices, storage accounts, text and instant messages, social media accounts, physical files, and "every other location where Plaintiffs' materials may exist"; make available for imaging and forensic preservation every device or storage platform that has contained Plaintiffs' business information; and provide the passcode to his company-issued phone. For the reasons set forth below, Plaintiffs have shown a sufficient likelihood of success at this stage regarding Defendant's alleged trade secrets misappropriation. However, their request goes too far. The motion is granted in part and denied in part as set forth below.

## II. BACKGROUND

MISCOwater, Defendant's former employer, is a manufacturer's representative firm owned by UFT. As a manufacturer's representative firm, Plaintiffs have distributorships with product manufacturers in the water treatment industry. They purchase products from the product manufacturers and sell them at a marked-up price to customers, municipal water and wastewater treatment facilities, contractors who work on related projects, and industrial markets. Many of the water and wastewater projects are awarded through public bidding processes during which the project specifications, participating contractors, and bid information are made publicly available.

Defendant began working for MISCOwater in 2020 after years working for a manufacturer in the water and wastewater treatment industry, a competing water and wastewater manufacturer's representative firm, and a manufacturer's representative firm in the chemical feed equipment industry. Defendant brought this experience to MISCOwater, and during his tenure, MISCOwater expanded its business, including in the chemical feed space.

In 2023, Poly Processing Company, LLC ("Poly Processing"), a customer of MISCOwater that operates in the same field, expressed concerns about weak sales performance in Colorado. MISCOwater presented Defendant with a revised compensation plan, increasing his commission rate, in order to help improve performance in Colorado. However, in October 2025, Poly Processing cancelled its distributorship with MISCOwater in Colorado. On January 6, 2026, MISCOwater presented Defendant with a new compensation plan, which included a reduced commission rate as well as prohibitions against discussing compensation. Defendant refused to agree to the plan. On January 15, 2026, MISCOwater terminated Defendant.

Prior to his termination, Defendant retained certain confidential records from MISCOwater. He alleges he did so based on concerns that MISCOwater would not pay commissions he earned, totaling nearly one million dollars according to Defendant. Plaintiffs allege Defendant retained these records to compete improperly against MISCOwater.

In the weeks following Defendant's termination, Plaintiffs learned form a former MISCOwater employee and from an official at their customer, Poly Processing, that the word on

United States District Court
Northern District of California

the street was that Plaintiffs had cut Coholan's compensation in half due to a recent private-equity transaction. In February 2026, Defendant was hired by Goble Sampson Associates ("GSA"), a MISCOwater competitor. Following Defendant's termination, five other employees left MISCOwater, four of whom also joined GSA. In March 2026, ProMinent, another customer, informed MISCOwater that they would be ending their business relationship with them. GSA replaced MISCOwater as ProMinent's distributor. MISCOwater also lost distributorships with Poly Processing in California and Nevada to GSA.

On March 3, 2026, Plaintiffs filed this lawsuit against Defendant for violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.* ("DTSA") and the California Trade Secret Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.* and for interference with prospective economic advantage, interference with contract, defamation, trade libel, and unfair competition under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* They moved for a temporary restraining order ("TRO") on March 10, 2026. A hearing was held on March 16, 2026, at which Defendant's counsel represented that Defendant had not sent any of the materials he took from Plaintiffs to anyone else.

Shortly after the hearing, Plaintiffs' motion for a TRO was granted in part and denied in part, finding insufficient likelihood of success on the merits for Plaintiffs' defamation and trade libel claims. Defendant was ordered to return any and all materials containing Plaintiffs' trade secret information and material taken from Plaintiffs between March 3, 2025 and January 15, 2026, and Plaintiffs were ordered to preserve all materials returned to Plaintiffs.

On March 17, 2026, Plaintiffs learned that Defendant had contacted a repeat MISCOwater customer who appears in the confidential material and informed them that GSA was "now the distributor for" ProMinent. On March 18, 2026, Coholan uploaded 43 files to a ShareFile link Plaintiffs provided. Plaintiffs assert that these files were not uploaded in their original format but rather as PDFs and in some cases compiled into combined files.

On March 18, 2026, GSA's counsel informed Plaintiffs that on March 6 and March 7, Defendant shared Plaintiffs' materials with GSA's chief financial officer ("CFO") in connection

with an investigation conducted by GSA at Defendant's request. The CFO accessed the documents through a login that Defendant provided. GSA returned those documents to Plaintiffs on March 19, 2026.

On March 19, 2026, Plaintiffs' counsel raised concerns about deficiencies in Defendant's March 18 production. Plaintiffs had not identified some files in the production because they were not in their native formats. Defendant made a supplemental production with newly produced materials as well as reproduced materials on March 19, 2026.

Over the last three weeks, Plaintiffs discovered through forensic analysis that Defendant had connected USB devices to his computer 81 times between October 2025 and January 2026. Defendant has not produced any USBs to Plaintiffs.

Plaintiffs also report that another major distributor indicated its intent to take its business to GSA and that Plaintiffs have had to spend significant time fielding calls from concerned customers and partners, conducting site visits, and retaining and recruiting talent.

### III. LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). To obtain preliminary injunctive relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365. A court may "balance the elements" of this test, "so long as a certain threshold showing is made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Thus, for example, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quotation marks omitted).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less

United States District Court
Northern District of California

PI ORDER
CASE NO. 26-cv-01845-RS

formal and evidence that is less complete than in a trial on the merits." *U. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Evidentiary issues properly go to weight rather than admissibility. *E.g., Armstrong v. Newsom*, 475 F. Supp. 3d 1038, 1044 n.2 (N.D. Cal. 2020)*; WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

#### a. Violations of the Defend Trade Secrets Act (DTSA) and the California Uniform Trade Secret Act (CUTSA)

Plaintiffs assert Defendant has violated federal and California trade secret law, the DTSA and CUTSA, respectively. Courts analyze these claims together because the elements are substantially similar. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove that the plaintiff possessed a trade secret, which defendant misappropriated. 18 U.S.C. §§ 1839(3), (5); *Autodesk, Inc. v. ZWCAD Software Co., Ltd.*, No. 14–1409, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015).

#### i. Identification of Trade Secrets

A "trade secret" is (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret. *See* 18 U.S.C. § 1839(3). The information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3). A plaintiff "must identify the trade secrets and carr[ies] the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). "The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons… skilled in the trade.' " *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (internal citation omitted).

United States District Court
Northern District of California

A plaintiff must "clearly refer to tangible trade secret material" instead of referring to a "system which potentially qualifies for trade secret protection." *Id.* at 1167.

Following issuance of the TRO, Defendant produced to Plaintiffs over forty files containing booking records, cost and margin breakdowns, and budgetary proposals for important MISCOwater customer projects; accounting and profitability "notes"; bid and negotiation histories; sales opportunity notes; plans for expanding MISCOwater's chemical feed growth business; and employee sales histories. These reflect the categories of "Plaintiffs' Trade Secrets" defined in Plaintiffs' motion for a TRO. *See* Dkt. 14, Mot. for TRO, at 4–5 ("[d]etailed cost and margin breakdowns for Plaintiffs' most important projects;" "[t]echnical specifications and supply lists;" "[p]roejct notes regarding the 'critical path' to company profitability;" "confidential negotiated payment and delivery terms;" "[b]id and negotiation histories;" "booking records with profit margins, project descriptions, scope descriptors, partner identities and contact information, and sales opportunity notes;" and "[c]onfidential sales histories for Plaintiffs' employees.").

These categories, excluding budgetary proposals made public and employee sales histories as discussed more below, reflect information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). *See, e.g.*, *Kinect Renewable Sols., LLC v. DesVerney*, 2022 WL 21768580, at *6 (C.D. Cal. Mar. 15, 2022) (Information relating to "customers, vendors, products, pricing, marketing, finances, [and] sourcing" were likely to be shown to include protectible trade secret information sufficient to support issuance of an ex parte TRO); *Pollara v. Radiant Logistics, Inc.*, 650 F. App'x 372, 373 (9th Cir. 2016) (quoting *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997)) ("Under the [CUTSA] a customer list may constitute a protected trade secret if it includes nonpublic information that provides a 'substantial business advantage' to competitors."); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. June 10, 2016) ("Customer information such as sales history and customer needs and preferences constitute trade

secrets.").[1] The cases that Defendant relies on to argue otherwise, i.e., that cost, margin, and budget details are not trade secrets, fail to provide support.

*Silvaco Data Systems v. Intel Corporation* sets out, in the context of software design and methods for carrying out certain functions, that a "trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact[.]" 109 Cal. Rptr. 3d 27, 38 (Cal. App. 6th Dist. 2010), *as modified on denial of reh'g* (May 27, 2010), *disapproved of on other grounds by Kwikset Corp. v. Super. Ct.*, 246 P.3d 877 (Cal. 2011). In the context of cost and profit management the "idea" might be to prioritize quality over keeping costs low while maintaining a competitive margin for some time or for some customers or it might be to minimize costs. The "idea" is communicated through information (i.e., strategies and decisions) inherent in material like that Defendant took, including cost and margin breakdowns, technical specifications and supply lists, budgetary proposals, accounting and profitability schemes, and bid negotiations.

Defendants also cite *Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, but this case is inapposite. 819 F. Supp. 2d 1001 (E.D. Cal. 2011). There, the alleged trade secrets did not qualify because they were plainly manifested to anyone who used the software program. Here, by contrast, Plaintiffs' cost and pricing strategies are not made plain by the set of projects they take on. In a middleman market like Plaintiffs' where "Plaintiffs are not manufacturers of products" but instead "purchase products from vendor[s], mark-up the products, and then sell them to customer contractors," Dkt. 42, Opp., at 8, 18, supply, cost, and pricing choices are exactly how players differentiate themselves. If those strategies were manifested as in *Agency* there would be no way to compete and no marketplace.

For similar reasons, *Aetna Building Maintenance Co. v. West* is also inapposite. 246 P.2d

---

[1] Plaintiffs did not raise their efforts to protect the purported trade secrets in their Brief for a PI. They did so, however, in their Motion for a TRO and their Reply in support of their motion for a PI. They explain they keep Plaintiffs Trade Secrets on internal encrypted servers which require multi-factor authentication login by specific personnel with legitimate work-related need to access. Dkt. 14, Mot. for TRO, at 7–8; Dkt. 44, Reply ISO PI, at 12–13. Written policies prohibiting employees from disclosing confidential and proprietary business material and requiring the return of such material upon termination also reflect Plaintiffs' efforts to protect their trade secrets. Dkt. 14, Mot. for TRO, at 8; Dkt. 44, Reply ISO PI, at 13. At this stage, this is sufficient.

United States District Court
Northern District of California

11 (Cal. 1952). There, "[t]he evidence clearly show[ed] that the janitorial business does not depend upon patrons whose work can be done at an exceptionally low cost." *Id.* at 16. By contrast, in a middleman business like that of manufacturer's representative firms, cost is a crucial differentiator.

*Aetna* also makes clear why sales opportunity notes and other customer contact details are protectible: trade secrets may exist in the form of the "peculiar likes and fancies and other characteristics of [a] former employer's customers where such knowledge will aid him in securing and retaining their business." *Id.* (internal quotation marks omitted). This type of material was not protectible in *Aetna* because in the janitorial business "superiority of product or service… is the basis for patronage." *Id.* By contrast here, where Plaintiffs' market is a middleman market, "personal relationships" and "knowledge of the customer's desire for specialized information, his preference for certain products, and his buying habits" are key differentiators. *Id.*

There are, however, two categories for which Plaintiffs have not satisfied their burden to establish the existence of trade secrets. First, to the extent Plaintiffs assert that public proposals, or proposals made public later in substantially the same form, are trade secrets, they are not likely to succeed. Public proposals do not "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Second, Plaintiffs are not likely to succeed in showing that employee sales histories are trade secrets. They have not shown efforts to ensure employees treat their own sales histories as secret nor that independent economic value can be derived from sales histories.

In summary, especially in light of the fact that manufacturer's representative firms compete primarily on price, product selection, and relationships, Plaintiffs have shown at least serious questions as to whether the following categories of material taken by Defendant contain trade secrets: booking records, cost and margin breakdowns, *non-public* budgetary proposals, accounting and profitability "notes," bid and negotiation histories, sales opportunity notes, and expansion plans. Plaintiffs have not met their burden that public budgetary proposals, budgetary proposals later made public, or employee sales histories are trade secrets per 18 U.S.C. § 1839(3).

United States District Court
Northern District of California

ii.   Misappropriation or Misuse of Trade Secrets

To show misappropriation for the purposes of stating a DTSA/CUTSA claim, a plaintiff must show one of two categories: (1) wrongful acquisition, or (2) disclosure or use of the trade secret without consent. 18 U.S.C. § 1839(5)(A)–(B). Plaintiffs' productions confirm misappropriation. Courts routinely find misappropriation when an employee subject to confidentiality obligations copies or forwards proprietary materials in anticipation of departure. Dkt. 14 at 15. *See, e.g.*, *Implicit Conversions, Inc. v. Stine*, 2024 WL 4112335, at *9 (N.D. Cal. Sept. 6, 2024) (downloading proprietary information supports misappropriation); *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *4 (N.D. Cal. Mar. 15, 2018) ("[D]ownloading and removing the Da Vinci Project information was theft or, at minimum, a breach of Defendant's contractual duty to maintain secrecy."). Defendant persuasively argues that he transmitted company information to himself not to compete unfairly but rather to protect himself in light of an ongoing dispute about his performance and commissions. Yet, whatever the motivation, it does not change the fact that Defendant sent himself confidential information, and acquisition by improper means is, by itself, enough to establish misappropriation. 18 U.S.C. § 1839(5)(A); Cal. Civ. Code § 3426.1(b)(1); *Comet Techs.*, 2018 WL 1990226, at *4 (finding misappropriation, and granting a motion for temporary restraining order, where the defendant had removed plaintiff's confidential information and gone to work for a competitor). Moreover, Defendant disclosed the material he took from Plaintiffs to GSA's CFO without Plaintiffs' consent to do so, establishing serious questions as to misappropriation by disclosure under 18 U.S.C. § 1839(5)(B).

**B. Irreparable Harm**

A plaintiff seeking injunctive relief must establish that he is likely to suffer irreparable harm in the absence of the preliminary relief sought. *Winter*, 555 U.S. at 20. Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

Since Defendant's termination, Plaintiffs have lost business and employees. Even if this

could be attributed to Defendant's misappropriation of trade secrets, Defendant persuasively argues these losses have an adequate legal remedy. *Ariz. Dream Act Coal. v. Brewer* at 1068 (irreparable harm requires harm "for which there is no adequate legal remedy"). Nevertheless, "[c]ourts in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated." *BNF Dist. Enter. Inc., v. BA Dist., Inc.*, 2025 WL 3724558, at *17 (N.D. Cal. Dec. 24, 2025) (internal quotation marks and citation omitted). Courts in this district have also found that when a former employee now with a competitor continues to possess trade secrets, there is irreparable harm because "[m]isuse of that treasure trove remains an ever-present danger wholly at [the former employee's] whim," and such misuse "cannot be unwound after the fact, nor can it be adequately compensated for with monetary damages." *Waymo LLC v. Uber Technologies, Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017). Accordingly, Plaintiffs suffer irreparable harm while Defendant retains trade secrets he is ready and willing to use while employed by a competitor, namely GSA.

### C. Balance of Hardships and Public Interest

Finally, a plaintiff seeking a preliminary injunction must show that "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. As to the first, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24, 129 S.Ct. 365.

Here, Defendant writes that "Mr. Coholan has returned the documents and has no intention of using anything that would constitute a trade secret of Plaintiffs." Dkt. 42, Opp. to Mot. for PI, at 26. Accordingly, an injunction enjoining Defendant from "using anything that would constitute a trade secret of Plaintiffs" would not burden Defendant while it would protect Plaintiffs' trade secrets and rights to fair competition in the marketplace. *Id.* However, the scope of Plaintiffs' requested relief pushes far beyond limiting Defendant's use of trade secret material, hamstringing his ability to perform his job and to compete fairly, in turn violating California's "settled public policy in favor of open competition" and protections for employee mobility. *Hill Med. Corp. v. Wycoff*, 86 Cal.App.4th 895 (2001); Bus. & Prof. Code, § 16600 (recognizing as void any

agreement "by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind"). *See also Golden v. Cal. Emgncy Phys. Med. Grp.*, 896 F.3d 1018, 1022 (9th Cir. 2018) (internal quotation marks and citations omitted) ("The law protects Californians and ensures that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice."). Accordingly, the preliminary injunction will be limited in scope to reflect a balance of equities between both parties and align with, rather than conflict with, the public's interest in fair competition.

### D. Scope of Preliminary Injunction

Emergency injunctive relief should not provide "a remedy beyond what [i]s necessary to provide relief" to the injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Plaintiffs' requested relief goes too far, obstructing rather than protecting fair competition where it seeks to enjoin Defendant from contacting any customers or distributors included in the misappropriated materials for six months. Defendant, however, is enjoined from using and must return all material taken from Plaintiffs reflecting "[d]etailed cost and margin breakdowns," "[t]echnical specifications and supply lists," "notes regarding the 'critical path' to company profitability," "payment and delivery terms," "[b]id and negotiation histories," "booking records," and "sales opportunity notes." Dkt. 14, Mot. for TRO, at 4–5. If Defendant later finds publicly available material reflecting this information, he may use that publicly available information, but until specific showings are made that given information is discernible through publicly available material, the presumption is that such material reflects Plaintiffs' Trade Secrets.

Plaintiffs' requests related to uncovering what confidential material Defendant improperly sent himself and retains, beyond that already produced, are warranted with limitations. Defendant must submit to inspection of his devices and storage accounts (e.g., Dropbox, cloud storage) and make available for imaging and forensic preservation every device or storage platform that has contained Plaintiffs' business information. He must also provide the passcode for his company-issued phone. However, Defendant is not required to submit to inspection his text and instant messages, social media accounts, physical files, and "every other location where Plaintiffs' materials may exist." Dkt. 39, Brief for PI, at 24–25. The burden on Defendant and invasion of

PI ORDER
CASE NO. 26-cv-01845-RS

11

privacy outweighs the protective value of such measures. Plaintiffs may seek such material in discovery.

### V. CONCLUSION

For the foregoing reasons, the motion for a PI is granted in part and otherwise denied. Plaintiffs shall be required to post an additional bond of $25,000.

**IT IS SO ORDERED**.

Dated: April 20, 2026

_____
RICHARD SEEBORG
Chief United States District Judge